IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CASCADE FUNDING GROUP, LLC, )
)
        Plaintiff, ) TC-MD 110206C
)
    v. )
)
DESCHUTES COUNTY ASSESSOR, )
)
        Defendant. ) **DECISION**

    Plaintiff has timely filed a property tax valuation appeal for the 2010-11 tax year

consisting of 20 separate tax lots (subject property).[1] The appeal involves a storage facility in

Bend designed for the storage of recreational vehicles (RVs).

    Trial on the matter was held by telephone on November 11, 2011. Plaintiff was

represented by James Bruce (Bruce), the owner/manager of Cascade Funding Group, LLC.

Testifying for Plaintiff at trial was Darrell Deglow (Deglow), a commercial Real Estate

Appraiser who works in the Bend area where the property is located. Defendant was represented

by Todd Pade (Pade), Commercial Appraiser, Deschutes County Assessor's office. Pade is an

Oregon Registered Appraiser. Plaintiff's exhibits 1-8, and Defendant's exhibits A-E were

admitted without objection.

## I.    STATEMENT OF FACTS

    This is an improvement-only appeal involving a 20-unit ministorage facility specifically

designed for the storage of RVs. "Each of the units is a separately platted condominium, with its

own automatic roll-up overhead door." (Def's Ex. A at 5.) Eighteen of the 20 units are 13 feet

wide and 46 feet deep for a total area of 598 square feet. (*Id.*) The remaining 2 units, one on

---

[1] The account numbers are 259648, 259649, 259650, 259651, 259652, 259653, 259654, 259655, 259656, 259657, 259658, 259659, 259660, 259661, 259662, 259663, 259664, 259665, 259666, and 259667.

each end of the long rectangular building, are double units with a total square footage slightly more than twice that of the other 18 units.[2]  (*See Id.*)

According to Defendant's appraisal report, much of which was supported by the testimony of Plaintiff's representative Bruce, the building sits on a concrete slab and has steel framing with enamel-coated steel siding and roofing.  (*Id.*)  "Each unit has a dry pipe fire suppression system, and a ceiling mounted gas heater."  (*Id.*)  All of the units have individually metered electric power and lighting.  (*Id.*)  Deglow testified that it was necessary to heat the vacant units to keep the renters of the neighboring units from complaining about excessively high heating costs.  The complex has additional shared amenities including a large turn around area and security features.  (*See Id.* at 31.)

In its Complaint, Plaintiff requested a total real market value (RMV) of $330,000, with the 2 larger units valued at $30,000 each and the remaining 18 units valued at $15,000 each. (Ptf's Compl at 1.)  At trial Plaintiff requested a reduction in the total RMV to $321,725.  The total RMV currently on the assessment and tax rolls is $1,155,140.  (*See* Compl.)  Defendant agreed at trial that the property is overvalued, and has asked the court to place the RMV at $498,700.

Plaintiff's appeal relies solely on the income approach.  (*See* Ptf's Ex. 4.)  Defendant valued the property using both the income and sales comparison approaches.  (Def's Ex. A at 12, 20, 35, 36.)  However, at trial, Defendant's appraiser Pade stated that he relied primarily on the income approach.  (*Id.*)  The court's analysis will therefore focus on the income approach.

As of the assessment date the subject property was advertising rental rates of $285 per month for the rental of a "regular" unit and $500 per month for the two "double" units.  (Ptf's Ex. 4 at 2.)  Deglow testified that the advertised price is usually discounted and that the real rate

---

[2] The unit on the west end of the building is 1,214 sq. ft.  The unit on the east end of the building is 1,250 sq. ft.  (Def's Ex. A at 5.)

per month for the regular units averaged $250, resulting in total annualized "Potential Gross Income" (PGI) of $66,000.[3] (*Id.*) Plaintiff reported an actual "Vacancy/Collection" loss of 45 percent as of the assessment date, but Deglow testified that a realistic rate was 18 percent. Using Plaintiff's realistic vacancy number results in a "Vacancy/Collection" loss of $11,880 and an "Effective Gross Income" (EGI) of $54,120. (*Id.*) Plaintiff's total expenses, including a two percent "Reserve for Replacement" and including property taxes results in total expenses of $28,232, or 52 percent (rounded) of EGI. When property taxes are excluded from expenses, total expenses are $20,115, or 37 percent (rounded) of EGI. (*See Id.*) Plaintiff then subtracted expenses from EGI resulting in a "Net Operating Income" (NOI) of $28,906.[4] (*Id.*) Plaintiff's Exhibit 8 was submitted as evidence of the cap rate selected by Deglow. Plaintiff relies on the downward economic trend in the central Oregon region, including "limited demand, high vacancies and declining income and price levels" to determine the appropriate cap rate. (Ptf's Ex. 8 at 3.) This is a trend that Defendant agreed with, noting that "[f]rom approximately the last half of 2007 up to the present time, the industrial condominium market has been declining in value." (Def's Ex. A at 12.) Additionally, Plaintiff used the results of a "PwC Real Estate Investor Survey" showing increasing cap rates from the 1st quarter of 2008 through the 3rd quarter of 2010. (*Id.* at 2.) The assessment date is bracketed by average cap rates of "8.80% with a range from 6.50% to 12.00%" for the fourth quarter of 2009, and "8.73% with a range from 7.00% to a high of 12.00%" for the first quarter of 2010. (*Id.*) Plaintiff selected a cap rate of 9 percent to arrive at an "Indicated Market Value" of $321,178. (Ptf's Ex. 4 at 2.)

/ / /

/ / /

---

[3] $250/mo. x 18 units = $4500; $500/mo. x 2 units = $1000; PGI subtotal = $5500 x 12 mo. = $66,000.
[4] Plaintiff appears to have made a mathematical error when calculating NOI. If Plaintiff had included property taxes in the total expenses NOI should have been $25,888, with property taxes excluded NOI should have been $34,005.

At trial Deglow testified that the income for the 18 smaller units should be $230 per month per unit rather than $250, and that the capitalization rate should be between 9.5 percent and 10.5 percent.

Defendant considered both the sales comparison method and the income approach. (Def's Ex. A at 36.) To support the sales comparison method Defendant submitted three unadjusted comparable properties. (Def's Ex. A at 14-18.) After Defendant's sales comparison analysis, Defendant concluded an "Indicated Market Value by the Sales Approach * * * of * * * $943,500." (*Id.* at 20.)

Defendant's income approach first examined the reported income, vacancy and expenses of the Plaintiff. Using Plaintiff's numbers Defendant established the gross annual income of the subject property using the rent roll and vacancy rates as of December 31, 2009, and January 30, 2010. (*See Id.* at 21.) Defendant calculated a monthly income of $2,915, annualized to $34,980 with a vacancy rate of 45 percent, and rent per square foot per month ranging from $0.34 to $0.53 per foot for the occupied units. (*See Id.*) Defendant calculated estimated expenses of $8,474.63 and taxes as $8,117.60. (*Id.*) Defendant also noted that the high vacancy rate is due to the fact that "[t]he owner, * * * had not been trying to lease out all of the spaces as they use a significant portion of the space in conjunction with their automobile wholesaling and service business on the neighboring property." (*Id.* at 22.)

Defendant then looked at five rent comparables, including one across the street from the subject property. (*Id.* at 23.) These comparables had rents per square foot ranging from a low of $0.39 to a high of $0.58. (*Id.*) Using these comparables, as well as the Plaintiff's advertised rents, the Defendant selected a market rent of $500 ($0.40/sq. ft.) for the two "double" units and $285 ($0.48/sq. ft.) for the 18 "regular" units resulting in PGI of $6,130 per month or $73,560

per year. (*Id.* at 32.)[5] Defendant used the "Compass Commercial Q4 2009 Survey" showing the overall vacancy rate for industrial property in Bend to be 16.2 percent, and then selected a 16 percent vacancy rate for the subject property because it is a "nearly new facility in good condition with a very good location." (*Id.*) Subtracting out the vacancy loss resulted in an EGI of $61,790. (*Id.*) Defendant then calculated allowable expenses, including a 1 percent reserve for replacement, but not including property taxes, of $19,651, or 32 percent (rounded), resulting in a NOI of $42,139. (*See Id.* at 35; S*ee also* Ptf's Ex. 4 at 2.) Defendant then selected a cap rate while noting that as of the assessment date "the market is experiencing declining rent rates, increasing vacancy rates, constrained lender financing, and economic uncertainties[,]" and that the "market has an oversupply of light industrial warehouses." (Def's Ex. A. at 33.) Defendant used eight comparable sales with cap rates ranging from a high of 8.1 percent to a low 6.5 percent. (*Id.* at 34.) Out of these eight comparables five had "cap rates ranging between 7.21% and 7.84%." (*Id.* at 33.) With the "two most recent sales, both occurring in January of 2010," having cap rates of 7.30% and 7.21%. (*Id.*) Defendant concluded that an appropriate cap rate is 7.25 percent, plus 1.2 percent for the effective tax rate, for a "Loaded Cap Rate" of 8.45 percent. (*Id.*) Defendant used these numbers to calculate an "Indicate[d] Market Value" of $624,000. (*Id.* at 35.) Defendant also determined a highest and best use for the subject property as "the best use of the improvements is to market the individual units or rent them out until such time as the market improves and that they can be sold off." (*Id.* at 11.) At trial Pade revised his calculation based off of new expense information provided by the Plaintiff to reach an indicated value of $498,700 (rounded).

/ / /

---

[5] Defendant's exhibit shows a value of $300 per unit for the 18 regular units, this appears to be a typo as the value used in the calculation was the previously determined $285.

Defendant also relied on two separate independent appraisals of the subject property to help in valuing the RV condominium units. (*Id.* at 12-13.) These independent appraisals showed a drop in the value of the subject property of approximately $260,000 during the time frame bracketing the assessment date of January 1, 2010. (*Id.* at 13.)

## II.    ANALYSIS

### A.    *Valuation of the Individual Tax Lots*

A preliminary issue is whether the tax lots should be appraised individually or combined into one economic unit. "Both statute and case law require that the value of each tax lot be separately assessed." *White v. Washington County Assessor,* 17 OTR-MD 45, 48 (2001) (citations omitted). ORS 100.555(1)(a) [6] requires that condominium units to be separately assessed and taxed "in like manner as other parcels of real property." And, given that each of the RV condominium units is a separate property tax account, the court must ultimately determine the value of each unit.

However, the statutes and case law do not definitively state whether the individual tax lots have to be individually appraised, or can be appraised as one entity with a value being apportioned to each individual tax lot. The determining factor in deciding whether to appraise tax lots individually or as one economic unit is the concept of highest and best use. *White*, 17 OTR-MD at 48. Highest and best use of an improved property is the use "that is legally permissible, physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, *The Appraisal of Real Estate* 277-78 (13th ed 2008).

In this case, each tax lot is a separately platted condominium, with each tax lot representing a single unit in the same building. Each unit has separate access and individually

---

[6] All references to the Oregon Revised Statutes (ORS) are to the 2009 version unless otherwise stated; all references to the Oregon Administrative Rules (OAR) are to the current version.

metered utilities, including heating. Deglow testified that it is necessary to heat the vacant units so the renters heating bills in the adjacent occupied units are not excessively high. All of the units are of uniform shape and size[7] and have the same amenities. Additionally each unit shares in the features of the common elements of the entire property, namely a large RV turn around space, a convenient location, and on-site security measures. Also, the current use of the property is that of a money producing investment (i.e., the units are individually rented). Given these facts, the court concludes that while each tax lot is an individual condominium unit, the value of each unit is tied to the use of the other units and, like other similar condominium units in the area, each is individually rented to the general public rather than owner-occupied. Moreover, on the applicable assessment date, all of the units were under a single ownership, the owner unable to sell any of the units. As such, the individual tax lots can be valued as part of one economic unit and then apportioned a fair share of the total value.[8]

ORS 100.555(2) does not preclude that approach, rather, it provides in part, that "[d]etermination of real market value of a [condominium] unit based upon a leasehold estate shall be the same as a unit in fee simple."

In reality, the question is more academic than practical because each party appraised the property based on the income attributable to the individual units, aggregated the data for an overall value, and then apportioned the total between the 20 individual condominium units. Moreover, both parties ultimately agree that the sale of the individual RV condominium units was unrealistic as of January 1, 2010, and therefore did not rely on the sales of individual RV condominium units in valuing the subject. Plaintiff let the facts speak for themselves; the units did not sell. Accordingly, Plaintiff did not attempt to value the individual units under the sales

_____

[7] All of the units are the same size with the exception of the two double units, which are approximately twice the square footage of the 18 regular units.
[8] There are 22 shares for the one economic unit, 18 shares for each regular unit and two shares for each of the two double units.

comparison approach. Defendant did employ the comparable sales approach, using the sales of similar individual industrial condominium storage units, but ultimately rejected that approach in favor of the income approach because of the unusual market fluctuation due to the unstable economy during the applicable time period. (Def's Ex. A at 13, 36.) Defendant acknowledged in its appraisal report that "[f]rom approximately the last half of 2007 up to the present time, the industrial condominium market has been declining in value." (*Id.* at 12.) Defendant then notes that two different independent fee appraisers valued the subject property for the lending institution financing the property, and their approach was to value the property in the aggregate and then derive an average unit value which, if accurate, shows a $13,000 drop in the value of the individual units (from $40,500 to $27,500) in a 16 month window (March 2009 and July 2010) bracketing the applicable assessment date of January 1, 2010. (*Id.* at 12-13.) Finally, Defendant concluded its written highest and best use analysis by stating that "the best use of the improvements is to market the individual units or rent them out until such time as the market improves and that they can be sold off." (*Id.* at 11.)

B.      *Income Analysis*

The issue before the court is the RMV of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). RMV is defined by statute as:

> "Real market value of all property, * * * means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arms-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1). The assessment date for the 2010-11 tax year was January 1, 2010.

ORS 308.007; ORS 308.210. Plaintiff, as the party seeking affirmative relief, has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). "For the valuation of real property all three approaches-sales comparison approach, cost approach, and income approach- must be considered. For a particular property, it may be that all three approaches cannot be applied, however, each must be investigated for its merit in each specific appraisal." OAR 150-308.205-(A)(2)(a). The approach of valuation to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue.*, 286 Or 529, 533 (1979). Here Plaintiff only considered the income approach, while Defendant considered the sales comparison approach and the income approach. Neither party considered the cost approach.

While the income approach may be the best approach to determine the value of the subject property, the rules require that all three approaches at least be considered, even if an approach is not applied. Based on the evidence and testimony of the parties the income approach is the best methodology to use in valuing the subject property. The cost approach is not appropriate, and the sales comparison approach, while usable, is not the best methodology given the market conditions and the lack of reliable comparable sales. Moreover, the appraisal experts for both parties in this case rejected the sales comparison approach.

When RMV is at issue "the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values plead by the parties." ORS 305.412.

Plaintiff presented evidence for an income of $250 a month per unit. (Ptf's Ex. 4 at 2.) Defendant presented evidence for an income of $285 a month per unit. (Def's Ex. A at 32.) A similar, "slightly inferior" property across the street from the subject property was also used as a

rent comparable by both parties. (*Id.* at 31; Ptf's Ex. 1 at 26.) Deglow testified that the slightly inferior property reported an average income of $235 per month per unit, with units of similar size to those of the 18 regular units on the subject property. Pade notes in his report that actual rents for the subject (the 18 598 square foot units) ranged from a low of $200 per month ($.34 per square foot) to a high of $315 per month ($53 per square foot). (Def's Ex. A at 22.) Moreover, the subject experienced a vacancy rate on the assessment date 45 percent, meaning that nearly half of the units were empty.

Based on the evidence presented the court determines an average rent per unit per month of $265 for the 18 regular units, and $500 a month for the two double units, annualized to a PGI of $69,240.

The current vacancy rate for the subject property is 45 percent (Ptf's Ex. 4 at 2; Def's Ex. A at 21.) Both Plaintiff and Defendant agree that the vacancy rate should be much lower. Plaintiff provided evidence for a vacancy rate of 18 percent. (Ptf's Ex 4. at 2.) Defendant produced evidence for a vacancy rate of 16 percent. (Def's Ex. A at 32.) Both Plaintiff and Defendant presented compelling evidence on the vacancy rate, and based on that evidence the court determines a vacancy rate of 17 percent is appropriate. PGI less the vacancy loss results in an EGI of $57,470 (rounded).

Pade revised Defendant's expense calculations at trial. Once the property tax component of expenses is removed the parties expense percentages were fairly close, 37 percent for Plaintiff and 32 percent for Defendant. An expense percentage, including a two percent replacement reserve, but excluding property taxes, of 35 percent is appropriate given the evidence submitted. A 35 percent expense rate yields total expenses of $20,115 (rounded). Subtracting the expenses from $57,470 EGI results in a NOI of $37,355.

Pade selected a cap rate of 7.25 percent based on the cap rates of comparable sales. However, due to the poor economic conditions "sales of actual investment grade industrial property did not begin to start until mid and late 2010[,]" well after the assessment date. (Ptf's Ex. 8 at 1.) Additionally, all of the comparables selected by Pade have issues calling into question the value of the extracted cap rates, including the sale date, foreclosure sales, location, vacancy rates, and buyer/owner occupancy. (*Id.*) Plaintiff in its valuation report selected a cap rate of 9 percent based on the local market conditions as of the assessment date, as well as a PwC investor market survey. Plaintiff's appraiser Deglow testified that more appropriate cap rate was between 9.5 percent and 10.5 percent. Based on the testimony at trial and the documentary evidence presented, the court concludes that a base cap rate of 9 percent is appropriate for the subject property. A property tax component of 1.2 percent needs to be added to the base rate for a total cap rate of 10.2 percent. A cap rate of 10.2 percent results in a valuation for the subject property, as of the assessment date January 1, 2010, of $366,225 (rounded).

### III.    CONCLUSION

On the evidence before it the court concludes that for an income based analysis the subject property had a PGI of $69,240, a vacancy rate of 17 percent, an EGI of $57,470, total expenses of 35 percent (or $20,115), for a NOI of $37,355, and a cap rate, including property taxes of 1.2 percent, of 10.2 percent. Those numbers result in a valuation for the subject property of $366,225. The 18 smaller single units identified as Accounts 259649, 259650, 259651, 259652, 259653, 259654, 259655, 259656, 259657, 259658, 259659, 259660, 259661, 259662, 259663, 259664, 259665, 259666 shall each have a value of $16,646 (rounded), and the two double units identified as Accounts 259648 and 259667 shall have a value of $33,298 each. Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that the Plaintiff's appeal is granted and the real market value for each of the property is identified as Accounts 259649, 259650, 259651, 259652, 259653, 259654, 259655, 259656, 259657, 259658, 259659, 259660, 259661, 259662, 259663, 259664, 259665, and 259666, is $16,646 as of January 1, 2010.

IT IS FURTHER DECIDED that the real market value for Accounts 259648 and 259667 is $33,298 each as of January 1, 2010.

Dated this ___ day of July 2012.


_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on July 26, 2012. The Court filed and entered this document on July 26, 2012.*